UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

NATIONAL AMUSEMENTS, INC.,

        Plaintiff,

    v.

BOROUGH OF PALMYRA

        Defendant.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 08-2469
(JEI/KMW)

**OPINION**


**APPEARANCES:**

CONNELL FOLEY, LLP
Kevin J. Coakley
85 Livingston Avenue
Roseland, NJ 07068
    Counsel for Plaintiff

MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGIN, PA
Richard L. Goldstein
Woodland Falls Corporate Park
200 Lake Drive East
Suite 300
Cherry Hill, NJ 08002
    Counsel for Defendant


**IRENAS**, Senior District Judge:

    This action initially arose due to Defendant Borough of Palmyra ("Palmyra") issuing a resolution closing Plaintiff National Amusement, Inc.'s ("National") flea market to the public.  Palmyra now moves for summary judgment.

1

**I.**

Some of the facts, and inferences drawn from those facts, are disputed. The Court resolves those discrepancies in favor of National.

During, and shortly after World War II, Palmyra owned National's property. (*See* National's Counter Statement of Facts ¶ 1). During that time, Palmyra authorized the United States Army to test munitions. (*Id.*) The former impact zone of that weapons testing is located where National operated the flea market. (*See* Towey's Cert. Ex. I, Dkt. No. 4)[1]

In November of 1955, National's predecessor, M.E.S. Realty, Inc., purchased the 65.4 acre parcel. (*See id.* ¶¶ 3-5) On August 21, 1986, M.E.S. Realty, among other entities, merged leaving National as the surviving corporation. (*Id.* at Ex. B)

In the intervening years, National has used the property for a variety of commercial purposes including as a drive-in movie theater and as an open air flea market. (*See* Palmyra's Statement Uncontested Facts ¶ 4; Towey's Cert. ¶¶ 3-5, 7) Beginning in January of 1976, National operated the lawful open-air flea market on the weekends using twenty-five acres of the property.

---

[1] National cites almost exclusively to the Certification of William J. Towey, National's Senior Vice President of Operations, that was submitted in support of National's Motion for Preliminary Injunction. (*See* Dkt. Nos. 3-4) Although Palmyra objects to the admissibility of this Certification on the grounds that it is merely an unsubstantiated pleading, this signed document is equivalent to a sworn affidavit or declaration. Record support for assertions in opposition to a motion for summary judgment need not be contemporaneously submitted with the brief. Fed.R.Civ.P. 56(c)(1)(A).

(*See* Towey's Cert. ¶ 7)  "This use, although non-conforming pursuant to current Palmyra land use ordinances, is grandfathered under state law."  (National's Counter Statement of Facts ¶ 45) In furtherance of the business, National has made certain improvements including a concession stand and a paved parking lot.  (*See* Towey's Cert. at ¶¶ 11-12)

The flea market was successful and contained approximately 458 vendor spaces and flocks of customers.  (*See* Towey's Cert. ¶ 9; Palmyra's Statement of Uncontested Facts ¶¶ 6-7)[2]  At times, the traffic from the flea market badly congested local roads.  (*See* Palmyra's Statement of Uncontested Facts ¶ 7)  Although National employed police officers to control the crowds and direct traffic, the operation of the flea market caused tension between National and Palmyra.  (*See* Towey's Cert. ¶ 12)

Beginning in 2002, Palmyra began evaluating an economic redevelopment project that would span 186 acres including National's property.  (*See* Palmyra's Statement of Uncontested Facts ¶¶ 1-2)  In September of 2003, Palmyra designated several properties, including National's parcel, a Brownfield Redevelopment Area under New Jersey State Law.  *See* N.J.S.A. 40A:12A-1 *et seq.*  (*See* Towey's Cert. ¶ 18)

---

[2] Occasionally, Palmyra cites to Plaintiff's Amended Complaint to support factual assertions.  For the purposes of this Motion, the Court deems those sections of the Complaint undisputed.  *See* Fed.R.Civ.P. 56(e)(2).  All other unsubstantiated sections of the Amended Complaint, however, will not be considered as supported factual assertions.  *See* Fed.R.Civ.P. 56(c).

In connection with this designation, Palmyra contracted with Environmental Resources Management, Inc. ("ERM") to conduct a required environmental study.  (*See* Palmyra's Statement of Uncontested Facts ¶ 10)  These inspections uncovered the possibility of unexploded munitions and contaminated lands.  As a result, ERM contracted with Munitions Management Group, LLC ("MMG") to investigate possible unexploded munitions and safely dispose of them.  (*See* Towey's Cert. ¶¶ 21-22)

ERM submitted a work plan to the New Jersey Department of Environmental Protection ("NJDEP") to address the munitions disposal on National's property in October of 2007.  (*Id.* at ¶ 26)  Neither ERM nor MMG consulted with National or visited National's property before submitting the work plan.  (*Id.* at ¶ 27)

In attempting to avoid unnecessary disruption to its business, National attempted to negotiate with ERM and MMG a schedule that would permit the continuing operation of the flea market.  (*Id.* at ¶¶ 65-66)  On January 11, 2008, National, ERM and MMG entered into the Access Agreement.  (*Id.* at Ex. C)  The parties agreed, *inter alia*, that work would not be performed on the weekends or disrupt National's quiet enjoyment of the property.  (*Id.*)  Palmyra, however, did not sign the agreement. (*Id.*)

On March 10, 2008, during the course of the munitions

4

disposal operations, MMG observed a munition flush with the asphalt surface of the parking lot.  (*Id.* at ¶ 47)  The presence of a highly explosive munition at, or just below, ground level was particularly concerning because vendors at the flea market used stakes to secure tables and tarps.  (National's Counter Statement of Facts ¶ 38)  If a stake was driven into a live munition, the munition could detonate and cause serious injury or death.  (Palmyra's Statement of Uncontested Facts ¶¶ 20-21)

Furthermore, the risk at any given time is unpredictable. Munitions can change their subsurface depth due to frost heaving - a phenomenon in which subsurface ice forms and pushes objects towards the surface.  (*Id.* at ¶ 17)  MMG informally reported this information to Palmyra on March 10, 2008.

In response to this "imminent threat to public safety," on March 10, 2008, Palmyra drafted a resolution authorizing Police Chief Richard Dreby to request National to voluntarily close their operations or, if National refused, to exercise his emergency powers to restrict the public's access to National's property.  (*Id.* at Ex. I)  Although the redevelopment area encompassed neighboring properties, including two gas stations and the Palmyra Cove Nature Park, no other properties were affected by the resolution.  (*See* National's Counter Statement of Facts ¶ 14)

Upon Chief Dreby's request, National refused to close the

5

flea market voluntarily.  (*See* Palmyra's Statement of Uncontested Facts ¶ 32)  National contended that the flea market had been operating without incident for more than three decades and Palmyra was attempting to use the munitions as a pretext to close National's property indefinitely.  (*See* Towey's Cert. ¶¶ 56-57)

National asserts that NJDEP in conjunction with its ordnance oversight contractor, UXO Pro, Inc. ("UXO"), proposed an alternative that would have allowed the flea market to remain open while ensuring the safety of the public.  (*Id.* at ¶ 48) Instead of closing the property, National could have prohibited vendors from driving stakes into the ground and could have erected barriers surrounding the more hazardous areas.  (*Id.* at ¶ 49)

Before the property's closure, National was not afforded the benefit of notice and a hearing.  (*Id.* at ¶¶ 60-61)  National suspects, but has not presented record evidence, that Palmyra did not duly consider alternatives to closing the property prior to issuing the resolution.[3]  (*Id.* at ¶ 52)

In response to National refusing to close voluntarily, Chief Dreby issued an emergency order that closed National's property to all non-essential personnel effective March 12, 2008.  (*See* Palmyra's Br. Ex. J)  While the property was closed, MMG

---

[3] At this stage in the litigation, the Court need not credit evidence submitted on "information and belief."  (*See, e.g.,* Towey's Cert. ¶¶ 52-53) Factual assertions must have record support.

proceeded with munitions detection and disposal. (*See* Palmyra's
Statement of Uncontested Facts ¶ 40) Despite repeated requests,
however, MMG failed to provide National with updates regarding
the work or an estimated time of completion. (*See* Towey's Cert.
¶¶ 64, 66)

On March 14, 2008, MMG submitted a preliminary report to ERM
detailing the results of the initial sweep of March 10. (*See*
Palmyra's Br. Ex. G) MMG found one highly explosive munition and
several inert munitions. (*Id.*) In MMG's opinion, the presence
of those munitions warranted the highest level hazard warning
under the Environmental Protection Agency's Munitions and
Explosives of Concern Hazard Assessment Tool. (*Id.*) That hazard
level presented a danger too great for the land's use as a flea
market. (*Id.*)

Although National contends that Palmyra's resolution to
close the flea market predates MMG's report, which proves that
Palmyra used the unexploded munitions as a pretext to close
National's property, National submits no record evidence to
support such an inference. Indeed, the resolution does not even
rely on the report, but instead relies on MMG's informal
recommendation to close the flea market upon finding a dangerous
unexploded munition. (*Id.* at Ex. I) Regardless, National does
not dispute that unexploded munitions containing highly explosive
materials were found at the site of the flea market.

Over the course of subsequent disposal efforts, MMG discovered hundreds of munitions. (*See* Palmyra's Statement of Uncontested Facts ¶ 41)  Although some of these munitions were inert, others contained highly explosive live materials. (*Id.* at ¶ 42)

On May 29, 2008, Palmyra held a public hearing and declared the entire redevelopment area, including National's property, blighted. (*Id.* at ¶ 73, Ex. H)  The parties do not allege, however, that Palmyra commenced condemnation proceedings or otherwise utilized government powers of eminent domain.

After MMG remediated the paved parking area, National requested Chief Dreby to rescind the order closing National's property to the public. (*See* Towey's Cert. Ex. I)  On June 2, 2008, Chief Dreby issued a memorandum explaining the decision to reject National's request. (*Id.*)  First, due to equipment limitations, the areas immediately surrounding the concession building could not be tested. (*Id.*)  In the areas directly adjacent to the unscreened areas, however, MMG found high concentrations of munitions. (*Id.*)  Therefore, a reasonable inference could be made that the area immediately surrounding the concession building also contained munitions.  Second, Chief Dreby was concerned that MMG had not swept the entire parking lot. (*Id.*)  Instead, MMG tested a portion of the lot by transects. (*Id.*)  Although MMG opined that the safety risk was

8

low, especially if National took certain precautionary measures, Chief Dreby felt that any risk to public safety was too high. (*Id.*)

On June 3, 2008, MMG ceased all work until the New Jersey Economic Development Authority could assure further funding. (*See* Towey's Cert. ¶ 78, Ex. J)  In response, National sent a letter to Palmyra again demanding the rescission of Chief Dreby's order or at least an estimated time of completion. (*Id.* at Ex. K)

On June 6, 2008, National filed a Motion for Preliminary Injunction.  (*See* Dkt. Nos. 3-4)  In support of the Motion, National submitted the Certification of Wayne Lewallen, an expert in disposal of unexploded munitions.  (Lewallen's Cert. ¶ 1, Dkt. No. 4)  Lewallen agreed with MMG that the risk to public safety was low or minimal.  (*Id.* at ¶ 9)  After a review of Chief Dreby's memorandum and other relevant documents, Lewallen concluded that reopening National's business on the weekends while MMG continued disposal operations during the week would conform with industry standards.  (*Id.* at ¶¶ 15-16)

On July 30, 2008, Judge Bumb entered a Consent Order whereby National could resume operations by August 13, 2008 with certain institutional controls including the erection of barriers around high hazard areas and hiring security guards to enforce the institutional controls.  (*See* Consent Order ¶ 4, Dkt. No. 17)

All parties have complied with the terms of the Consent Order and the flea market is currently open to the public.  (Palmyra's Statement of Uncontested Facts ¶ 81)

On May 20, 2008, Defendants removed this action to federal court on the basis of federal question jurisdiction.  (*See* Dkt. No. 1)  On June 6, 2008, Plaintiff filed a Motion for Preliminary Injunction.  (Dkt. No. 4)  On July 30, 2008, Judge Bumb entered the Consent Order.  (Dkt. No. 17)  On December 11, 2008, National filed an Amended Complaint.  (*See* Dkt. No. 23)  For approximately the next two years, the parties fought principally over attorneys' fees.  On September 10, 2010, this case was reassigned from Judge Bumb to this Court.  (*See* Dkt. No. 103)  On September 30, 2011, Palmyra filed the instant Motion for Summary Judgment.  (*See* Dkt. No. 120)

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed.R.Civ.P. 56(c)).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to

10

the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 249.

### III.

National alleges three causes of action against Palmyra. First, National alleges a violation of procedural due process rights under the New Jersey Constitution and the Fourteenth Amendment of the United States Constitution.  Second, National alleges a temporary taking without just compensation in violation of the Fifth Amendment of the United States Constitution and Article One, Paragraph 20 of the New Jersey Constitution.

11

Finally, National alleges an action in lieu of prerogative writ for Palmyra's arbitrary and capricious decision to close National's property.[4]

## A.

As a preliminary matter, National alleges claims directly pursuant to the United States and New Jersey Constitutions. The Court will analyze the federal claims pursuant to 42 U.S.C. § 1983, however, because the United States Constitution itself does not provide a cause of action. Furthermore, the state and federal procedural due process claims utilize the same standard and will be analyzed together.[5] *State ex Rel. Cnty. of Cumberland v. One 1990 Ford Thunderbird*, 371 N.J.Super. 228, 244 (App.Div. 2004) (holding that the New Jersey Due Process Clause required the same result as its federal equivalent).

When a plaintiff sues under § 1983 alleging a failure to provide procedural due process, there is a two-part analysis: "(1) whether the asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty, or property; and (2) whether the procedures available provided the

_____

[4] Although National does not clearly identify this claim in the Amended Complaint, the claim's title in the original Complaint makes the basis of the claim clear. Moreover, Palmyra understood the basis of the Complaint, briefed the issue and will suffer no prejudice upon this Court's resolution of the issue on the merits.

[5] Defendant does not argue that the New Jersey constitutional claims require a different standard or result than the federal constitutional claims.

plaintiff with due process of law." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) (internal quotations omitted).

For the purposes of this Motion, Palmyra concedes that closing National's property to the public constituted a deprivation of National's property right.  (*See* Br. Palmyra 24 n.4, Dkt. No. 120)  Palmyra also concedes that National was not afforded the benefit of pre-deprivation notice and a hearing. Instead, Palmyra argues that the post-deprivation processes available to National satisfied due process.

Although due process generally requires notice and a hearing prior to the state's deprivation of private property, in some limited circumstances post-deprivation remedies can suffice.  To determine whether an aggrieved property owner has received due process, the Supreme Court has identified three factors:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Biliski v. Red Clay Consol. School Dist. Bd. of Educ.*, 574 F.3d 214, 220 (3d Cir. 2009) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Here, the private interest is the loss of profits derived from the approximate five month closure of National's flea

market.  On the other hand, Palmyra paid for the cost of the cleanup, which may have increased the value of National's property.

With regard to the second factor, the risk that National suffered an erroneous deprivation is minimal.  Palmyra held a meeting, considered the evidence MMG and ERM presented of live munitions on the property, and promptly acted to close National's property to protect the public.  National concedes that live munitions were present on the portion of the property used for the flea market.  In these circumstances, additional procedural safeguards, such as a pre-deprivation hearing, would prevent public servants from quickly responding to imminent risks to public safety.  Furthermore, National could seek damages - as it did in its Complaint - if there were an erroneous deprivation of property.

Finally, the government has an overwhelming interest in protecting public safety.  The detonation of a single munition could have caused a devastating toll on human life.  Although both parties submitted evidence that the risk to the public was low, Palmyra and Chief Dreby were within their discretion to refuse to accept a low probability of catastrophic human suffering.  National does not assert that the risk to the public was zero.  Any factual dispute, therefore, is tangential and not material to the government's exercise of emergency police powers

14

to avert a crisis.

In an analogous case, the Supreme Court came to the same conclusion and later affirmed the holding seventy years later. "[W]e upheld the right of a State to seize and destroy unwholesome food without a preseizure hearing." *Parratt v. Taylor*, 451 U.S. 527, 538 (1981) (overruled on different point of law) (citing *North American Cold Storage Co. V. Chicago*, 211 U.S. 306 (1908)). The public health emergency coupled with the aggrieved property owner's right to seek damages outweighed the possibility of erroneous property destruction. *North America*, 211 U.S. at 315. Although *North American* preceded *Mathews*, the Supreme Court identified the same factors in its balancing test and affirmed the holding in *Parratt*.

The case at bar is substantially similar. Palmyra unilaterally closed National's property temporarily upon discovering a serious and imminent risk to public safety. Although National was not afforded the benefit of pre-deprivation notice and a hearing, post-deprivation processes were available. National does not argue that those post-deprivation processes were inadequate. Accordingly, Palmyra's Motion for Summary Judgment will be granted on the procedural due process claim.

**B.**

Next, Plaintiff raises a temporary takings claim under both

15

the United States and New Jersey Constitutions.  As with the procedural due process claims, the New Jersey Constitution provides the same protections as the federal Constitution.  *See Klumpp v. Burough of Avalon*, 202 N.J. 390, 405 (2010).

The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation."  Const. Am. V.  "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (citing *United States v. Pewee Coal Co.,* 341 U.S. 114 (1951) (holding that the government's seizure and operation of a coal mine to prevent a national strike of coal miners constituted a taking).[6]

However, validly employed police powers are not necessarily in conflict with the Takings Clause.  *See, e.g., Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1034 (1992) ("The Takings Clause, while conferring substantial protection on property owners, does not eliminate the police power of the State to enact limitation on the use of their property."); *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 335 (2002) (noting that valid exercises of police power

---

[6] The parties have not attempted to identify the type of alleged taking in this case.  Though the distinction could prove important under different circumstances, it does not control the outcome here.  *See, e.g., Lingle*, 544 U.S. at 537; *Lucas*, 505 U.S. at 1015; *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435 (1982).

16

include "orders temporarily prohibiting access to crime scenes, businesses that violate health codes, [and] fire-damaged buildings.")[7]   The abatement of a public nuisance is one such valid exercise of police power.

Here, National operated a successful and heavily trafficked flea market scattered with live munitions.  MMG initially assessed the property as having the highest possible hazard risk. In response, Palmyra closed National's property for a mere five months to safely dispose of the munitions.  Although National argues that the risk to the public was minimal on June 2, 2008, National concedes that the experts could not assess the risk at zero.  (*See* National's Br. 17-19)  Palmyra was well within its discretion to maintain the property's closure for two additional months to bring the risk of catastrophic human suffering from minimal to zero.  Accordingly, the Motion for Summary Judgment on the takings claim will be granted.

### C.

Plaintiff's final claim is an action in lieu of prerogative writ.  The claim is derived from the New Jersey State Constitution.  "Prerogative writs are superseded and, in lieu thereof, review, hearing and relief shall be afforded in the

---

[7] National does not challenge, and must be deemed to concede, that Palmyra possessed the authority to pass and execute the resolution closing National's property.

Superior Court, on terms and in the manner provided by rules of the Supreme Court." N.J. Const. Art. VI, § 5, ¶ 4.

In other words, municipal actions may be reviewed by the judiciary. *See Rivkin v. Dover Tp. Rent Leveling Bd.*, 143 N.J. 352, 378 (1996). "A court may set aside a municipal board decision if it is shown to be arbitrary, capricious or unreasonable, not supported in the evidence, or otherwise contrary to law." *Id.* "The test is essentially one of rational basis." *Worthington v. Fauver*, 88 N.J. 183, 204 (1982). "Where there is room for two opinions, action is (valid) when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached." *Id.* (quoting *Bayshore Sewerage Co. v. Dept. Environ. Protection*, 122 N.J.Super. 184,199 (Ch.Div. 1973).

Here, the initial decision to close the flea market clearly had a reasonable basis. Unexploded munitions littered National's heavily trafficked flea market. Although Palmyra may have had a plethora of reasonable alternatives, the arbitrary and capricious standard does not require Palmyra to choose the one most favorable to National.

Similarly, Chief Dreby's decision not to rescind the Emergency Order of June 2, 2008 was not arbitrary or capricious. At that point, most of the work in Zone A, the most hazardous portion of the property, had been completed and the experts

agreed that the property posed a minimal risk to the public.
However, the experts could not assure Chief Dreby that the
property posed no risk to the public.  "Arbitrary action of
administrative bodies means willful and unreasoning action,
without consideration and in disregard of circumstances."
*Worthington*, 88 N.J. at 204.  Chief Dreby conferred with experts,
ascertained the relevant facts and determined that the risk to
public safety outweighed National's temporary deprivation of
property rights.  That judgment, whether correct or erroneous,
was not unreasonable, arbitrary or capricious.

National's final argument again asserts that the closure of
the flea market was merely a pretext because Palmyra did not
close adjacent properties.  National concludes that these facts
make the decision to close National's property arbitrary and
capricious.  National fails to realize, however, that Zone A,
which is entirely on National's property, presented the highest
risk of munitions because it was the former impact zone of the
weapons testing site.  National has not rebutted this evidence.
Therefore, Palmyra's decision to close National's property, but
not the neighboring properties, was reasonable considering it
posed the highest probability of containing munitions.  The
arbitrary and capricious standard does not require any further
inquiry into Palmyra's decision.

The decisions to close National's property in March and

19

maintain the closure in June were not arbitrary and capricious. Accordingly, the Motion for Summary Judgment will be granted with respect to the action in lieu of prerogative writ.

**IV.**

For the foregoing reasons, Palmyra's Motion for Summary Judgment will be granted.

Dated: February 3, 2012

 s/Joseph E. Irenas
**JOSEPH E. IRENAS, S.U.S.D.J.**

20